Timothy W. Brown
THE BROWN LAW FIRM, P.C.
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Robert C. Moest, SBN 62166
LAW OFFICES OF ROBERT C. MOEST
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Liaison Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY HUNTLEY, DERIVATIVELY AND ON BEHALF OF QUALCOMM INC., Plaintiff, vs. STEVEN M. MOLLENKOPF, GEORGE S. DAVIS, DEREK K. ABERLE, WILLIAM E. KEITEL, PAUL E. JACOBS, BARBARA T. ALEXANDER, DONALD G. CRUICKSHANK, SUSAN HOCKFIELD, RAYMOND V. DITTAMORE, THOMAS W. HORTON, HARISH MANWANI, MARK D. McLAUGHLIN, CLARK T. RANDT, JR., FRANCISCO ROS, JONATHAN J. RUBINSTEIN, MARK I. STERN and SHERRY LANSING, Defendants, and QUALCOMM INC., Nominal Defendant. | CASE No.:  '16 CV 0294 BTM RBB<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Danny Huntley ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Qualcomm Inc. ("Qualcomm," or the "Company"), brings this Verified Shareholder Derivative Complaint against Individual Defendants Steven M. Mollenkopf, George S. Davis, Derek K. Aberle, William E. Keitel, Paul E. Jacobs, Barbara T. Alexander, Donald G. Cruickshank, Susan Hockfield, Raymond V. Dittamore, Thomas W. Horton, Harish Manwani, Mark D. McLaughlin, Clark T. Randt, Jr., Francisco Ros, Jonathan J. Rubinstein, Marc I. Stern, and Sherry Lansing (collectively, the "Individual Defendants") seeking to remedy the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## NATURE AND SUMMARY OF THE ACTION

1.     The Company is a global semiconductor company that designs, manufactures and markets global digital communications products and services. Qualcomm operates in forty countries throughout the globe.

2.     Plaintiff, derivatively on behalf of Qualcomm, seeks to remedy the Individual Defendants' breaches of fiduciary duties and other violations of the law that occurred from February 1, 2012 through the present (the "Relevant Period").

3.     Plaintiff seeks to remedy the conduct of the Individual Defendants in making and/or causing the Company to make false and misleading statements regarding the Company's financial results and prospects.  The Company's public

misrepresentations of its financial prospects hid the truth of the Company's materially weakened OEM sales of devices, including its own products.

4.     Therefore, the Company's glowing statements about its business operations and prospects were not accurate.

5.     The Individual Defendants knew or deliberately turned a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  Consequently, the Company's stock price was trading at artificially inflated levels, and the Individual Defendants knowingly or recklessly failed to correct these false and misleading statements and omissions of material fact.

6.     When the fraud was partially exposed on January 28, 2015, the Company's stock price fell over 10%, $7.30 per share, to close at $63.69.

7.     After the fraud was fully exposed, Qualcomm stock price fell 3.75% on July 23, 2015, or $2.41 per share, to $61.78.

8.     The Company's stock price closed at $45.34 per share on January 29, 2016.

9.     The Company's public misrepresentations about its financial prospects subjected the Company and certain of the Individual Defendants to a federal securities class action that is pending in this Court.

10.     Plaintiff also seeks to remedy damages caused to the Company by the Individual Defendants' violations of the Foreign Corrupt Practices Act ("FCPA").

11.   The Company depends on its international customer roster for over 95% of its revenue, and the People's Republic of China (the "PRC"), in particular, for 50% of its revenue.

12.   As a global presence with extensive operations, the Company is subject to the FCPA which makes it unlawful to pay foreign officials to obtain or retain business.  Under the FCPA, companies are required to establish and maintain adequate internal controls to detect and prevent such payments.

13.   Furthermore, the FCPA provides that publicly-traded companies operating overseas create and maintain books, records, and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of those companies ("Books and Records").  The failure to maintain Books and Records can expose a company to substantial fines and sanctions, including potential civil and criminal liability.

14.   The Individual Defendants' failure to implement a sufficient and proper system of internal controls for the purpose of detecting and preventing FCPA violations has negatively impacted the Company.

15.   The Company has already significantly invested in its internal investigation into the FCPA violations.

16.   The Company also faces enforcement actions by the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

violations of the anti-bribery, Books and Records, and internal control sections of the FCPA.

17.    In light of the Defendants' conduct, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

18.    The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and unjust enrichment.

## JURISDICTION AND VENUE

19.    Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff Danny Huntley**

22.    Plaintiff is a current shareholder of the Company.  Plaintiff is a current shareholder of Qualcomm common stock, and has continuously held Qualcomm common stock at all relevant times.  Plaintiff is a citizen of North Carolina.

**Nominal Defendant Qualcomm**

23.    Nominal Defendant Qualcomm is a Delaware Corporation headquartered in San Diego, California.  The Company's stock has traded on the NASDAQ Global Market ("NASDAQ") under ticker "QCOM."

**Defendant Steven M. Mollenkopf**

24.    Defendant Steven M. Mollenkopf ("Mollenkopf") has been the Company's CEO since March 2014.  Defendant Mollenkopf has been a director of the Company since December 2013.

25.    During the period of time beginning on November 6, 2014 and ending on July 22, 2015 (the "Relevant Trading Period"), Defendant Mollenkopf sold a total of 111,885 shares of artificially inflated Company stock for proceeds of $7,956,242 (and made no purchases).  On March 13, 2015, Defendant Mollenkopf sold 180 shares, at $68.64 per share, for $12,355.   On December 12, 2014, Mollenkopf sold 43,711 shares, at $70.59 per share, for $3,085,559.  On November 30, 2014, he sold 35,161 shares, at $72.90 per share, for $2,563,236.  On November 20, 2014, he sold 14,538 shares, at $70.71 per share, for $1,027,981.  On November

5

9, 2014, he sold 18,295 shares, at $69.26 per share, for $1,267,111.

26.     The Company paid Defendant Mollenkopf $10.3 million in salary, bonus, stock awards and other compensation in 2015, $60.7 million in 2014, and $14.3 million in 2013.

27.     According to the Schedule 14A that the Company filed with the SEC on January 21, 2016 (the "2016 Proxy Statement"), as of December 14, 2015, Defendant Mollenkopf beneficially owned 278,881 shares of Qualcomm stock. Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Mollenkopf's beneficial ownership of Company stock was worth about $13.1 million.

28.     According to the 2016 Proxy Statement:

Mr. Mollenkopf has served as our Chief Executive Officer since March 2014 and as a director since December 2013. Mr. Mollenkopf has served as our Chief Executive Officer since March 2014. He served as Chief Executive Officer-elect and President from December 2013 to March 2014 and as President and Chief Operating Officer from November 2011 to December 2013. In addition, he served as Executive Vice President and Group President from September 2010 to November 2011, as Executive Vice President and President of QCT from August 2008 to September 2010, as Executive Vice President, QCT Product Management from May 2008 to August 2008, as Senior Vice President, Engineering and Product Management from July 2006 to May 2008 and as Vice President, Engineering from April 2002 to July 2006. Mr. Mollenkopf joined Qualcomm in 1994 as an engineer and throughout his tenure at Qualcomm has held several other technical and leadership roles. Mr. Mollenkopf holds a B.S. degree in electrical engineering from Virginia Tech and an M.S. degree in electrical engineering from the University of Michigan.

29.     Upon information and belief, Defendant Mollenkopf is a citizen of

California.

### Defendant George S. Davis

30.     Defendant George S. Davis ("Davis") has been the Company's CFO and Executive Vice President since March 2013.

31.     During the Relevant Trading Period, Defendant Davis sold a total of 24,830 shares of artificially inflated Qualcomm stock for proceeds of $1,678,866 (and made no purchases).  Defendant Davis disposed of 9,260 shares at $68.37 per share for $633,106 on May 5, 2015.  He also sold 15,516 shares, at $67.16 per share, for $1,042,054 on March 26, 2015.  On March 13, 2015, Davis sold 54 shares, at $68.64 per share, for $3,706.

32.     The Company paid Defendant Davis $4 million in in salary, bonus, stock awards and other compensation in 2015, $11 million in 2014, and $13.6 million in 2013.

33.     According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Davis beneficially owned 64,363 shares of Qualcomm stock. Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Davis's beneficial ownership of Company stock was worth over $3 million.

34.     According to the Company's annual report for the fiscal year ended September 28, 2015 that it filed on Form 10-K with the SEC on November 4, 2015 ("2015 10-K"):

George S. Davis, age 57, has served as Executive Vice President and Chief Financial Officer since March 2013. Prior to joining Qualcomm, Mr. Davis was Chief Financial Officer of Applied Materials, Inc., a provider of manufacturing equipment, services and software to the semiconductor, flat panel display, solar photovoltaic and related industries, from November 2006 to March 2013. Mr. Davis held several other leadership roles at Applied Materials from November 1999 to November 2006. Prior to joining Applied Materials, Mr. Davis served 19 years with Atlantic Richfield Company in a number of finance and other corporate positions. Mr. Davis holds a B.A. degree in Economics and Political Science from Claremont McKenna College and an M.B.A. degree from the University of California, Los Angeles.

35.   Upon information and belief, Defendant Davis is a citizen of California.

**Defendant Derek K. Aberle**

36.   Defendant Derek K. Aberle ("Aberle") has been the Company's President since March 2014.

37.   During the Relevant Trading Period, Defendant Aberle sold a total of 95,971 shares of artificially inflated Qualcomm stock for proceeds of $6,763,704 (and made no purchases).  Defendant Aberle sold 14,794 shares at $66.34 per share for $981,433 on June 15, 2015.  On May 13, 2015, Defendant Aberle sold 12,191 shares at $69.71 to $70.15 per share for $922,000.   Aberle also sold 19,878 at $68.37 per share for $1,351,469 on May 5, 2015.  On November 30, 2014, Aberle sold 25,695 shares, at $72.90 per share, for $1,873,165.  On November 20, 2014, he sold an additional 9,692 shares, at $70.71 per share, for $685,321.  On November 9, 2014, Defendant Aberle also sold 13,721 shares, at $69.26 per share, for $950,316.

38.     The Company paid Defendant Aberle $5.3 million in in salary, bonus, stock awards and other compensation in 2015, $32 million in 2014, and $10 million in 2013.

39.     According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Aberle beneficially owned 169,393 shares of Qualcomm stock. Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Aberle's beneficial ownership of Company stock was worth over $7.9 million.

40.     According to the Company's 2015 10-K:

Derek K. Aberle, age 45, has served as President since March 2014. He served as Executive Vice President and Group President from November 2011 to March 2014, as President of QTL from September 2008 to November 2011 and as Senior Vice President and General Manager of QTL from October 2006 to September 2008. Mr. Aberle joined Qualcomm in December 2000 and prior to October 2006 held positions ranging from Legal Counsel to Vice President and General Manager of QTL. Mr. Aberle holds a B.A. degree in Business Economics from the University of California, Santa Barbara and a J.D. degree from the University of San Diego.

41.     Upon information and belief, Defendant Aberle is a citizen of California.

**Defendant William E. Keitel**

42.     Defendant William E. Keitel ("Keitel") was the Company's CFO from February 2002 to March 2013 and, before that, Executive Vice President from December 2003 to March 2013.   Previously, Defendant Keitel was Senior Vice President and Corporate Controller.

43.     The Company paid Defendant Keitel $1,721,927 in salary, stock awards and other compensation in 2013.   In 2012, the Company paid him $7,038,504, and in 2011, Keitel received $7,716,837.

44.     According to the Schedule 14A filed by the Company with the SEC on January 16, 2013, as of December 17, 2012, Defendant Keitel beneficially owned 289,864 shares of Qualcomm stock.   Given that, as of the close of business on January 14, 2013, one share of common stock traded for $64.68, Defendant Keitel's beneficial ownership of Company stock was worth about $18.7 million.

45.     According to the Company's annual report for the fiscal year ended September 30, 2012 that it filed on Form 10-K with the SEC on November 7, 2012:

> William E. Keitel, age 59, has served as Executive Vice President since December 2003 and as Chief Financial Officer since February 2002. He previously served as Senior Vice President and Corporate Controller from May 1999 to February 2002. Mr. Keitel holds a B.A. degree in Business Administration from the University of Wisconsin and an M.B.A. from Arizona State University.

46.     Upon information and belief, Defendant Keitel is a citizen of California.

**Defendant Paul E. Jacobs**

47.     Defendant Paul E. Jacobs ("Jacobs") has been the Company's Executive Chairman since March 2014, and a Company Director since June 2005. Defendant Jacobs was the Company's CEO from July 2005 to March 2014. Defendant Jacobs was the Company's Chairman from March 2009 through March

2014.

48.     During the Relevant Trading Period, Defendant Jacobs sold a total of 411,561 shares of artificially inflated Qualcomm stock for proceeds of $25,970,586 (and made no purchases).  Defendant Jacobs sold 4,858 shares at $71.21 per share for proceeds of $345,938 on April 13, 2015.  On April 1, 2015, he sold 30,000 shares at $69.22 per share for proceeds of $2,076,600.  On March 10, 2015, Defendant Jacobs sold 70,000, at $78.31 per share, for $5,166,700; another 70,000 shares, at $44.75 per share, for $3,132,500.  On March 9, 2015, Davis sold 54,000, at $44.75 per share, for $2,146,500; and another 54,000 shares, at $72.21 per share, for $3,899,340.  On February 17, 2015, Jacobs sold 10,740 shares, at $70.73 per share, for $759,640.  On November 30, 2014, Jacobs sold 60,857 shares, at $72.90 per share, for $4,436,475.  On November 20, 2014, he sold 18,174 shares, at $70.71 per share, for $1,285,083.  On November 14, 2014, he sold 16,064 shares, at $70.84 per share, for $1,137,973.  On November 9, 2014, he sold 22,868 shares, at $69.26 per share, for $1,583,837.

49.     The Company paid Defendant Jacobs $56.9 million in salary, bonus, stock awards and other compensation in 2014, $20.4 million in 2013 and $20.7 million in 2012.

50.     According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Jacobs beneficially owned 1,772,594 shares of Qualcomm stock.  Given that as of the close of business on December 14, 2015, one share of

common stock traded for $46.83, Defendant Jacobs's beneficial ownership of Company stock was worth over $83 million.

51.     According to the 2016 Proxy Statement:

Dr. Jacobs is our Executive Chairman and Chairman of the Board of Directors. He has served as Chairman of the Board since March 2009 and as Executive Chairman since March 2014. He served as Chief Executive Officer from July 2005 to March 2014 and as Group President of Qualcomm Wireless & Internet from July 2001 to July 2005. In addition, he served as an executive vice president from February 2000 to June 2005. Dr. Jacobs was a director of A123 Systems, Inc. from November 2002 to July 2012. Dr. Jacobs holds a B.S. degree in electrical engineering and computer science, an M.S. degree in electrical engineering and a Ph.D. degree in electrical engineering and computer science from the University of California, Berkeley.

We believe that Dr. Jacobs's qualifications to serve on our Board include his extensive business, operational and management experience in the wireless telecommunications industry, including his current position as our Executive Chairman and his prior service as our Chief Executive Officer. His extensive knowledge of our business, products, strategic relationships and opportunities, as well as the rapidly evolving technologies and competitive environment in our industry, bring valuable insights and knowledge to our Board.

52.     Upon information and belief, Defendant Jacobs is a citizen of California.

**Defendant Barbara T. Alexander**

53.     Defendant Barbara T. Alexander ("Alexander") has been a Company Director since July 2006.  Defendant Alexander currently serves as Chairman of the Finance Committee.

54.     The Company paid Defendant Alexander $364,469 in fees, stock awards and other compensation in 2015; $368,017 in 2014; $390,536 in 2013; and

$387,508 in 2012.

55.    According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Alexander beneficially owned 46,144 shares of Qualcomm stock.  Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Alexander's beneficial ownership of Company stock was worth about $2.2 million.

56.    According to the 2016 Proxy Statement:

Ms. Alexander has been an independent consultant since February 2004. She was a senior advisor for UBS from October 1999 to January 2004 and a managing director of Dillon Read & Co., Inc. (Dillon Read) from January 1992 to September 1999. Prior to joining Dillon Read, Ms. Alexander was a managing director in the corporate finance department of Salomon Brothers. Ms. Alexander is past Chairman of the Board of the Joint Center for Housing Studies at Harvard University (the Center) and is currently a member of that board's executive committee and a senior industry fellow of the Center. Ms. Alexander has been a director of Allied World Assurance Company Holdings, Ltd. since August 2009 and Choice Hotels since February 2012. Ms. Alexander previously served as a director of KB Home from October 2010 to April 2014, Federal Home Loan Mortgage Corporation (Freddie Mac) from November 2004 to March 2010, Centex Corporation from July 1999 to August 2009, Harrah's Entertainment, Inc. from February 2002 to April 2007 and Burlington Resources, Inc. from January 2004 to March 2006. She holds B.S. and M.S. degrees in theoretical mathematics from the University of Arkansas.

We believe that Ms. Alexander's qualifications to serve on our Board include her significant financial and accounting experience. In addition, she has extensive experience serving on several other public company boards, including in most instances service on the compensation committee and/or the audit committee of those other boards, which provides valuable insights to our Board. Her experience at Freddie Mac has added to her knowledge regarding risk management issues.

57.    Upon information and belief, Defendant Alexander is a citizen of

California.

### Defendant Donald G. Cruickshank

58.     Defendant Donald G. Cruickshank ("Cruickshank") has been a Company director since June 2005.  Defendant Cruickshank has been a member of the Audit Committee since January 2012.

59.     During the Relevant Trading Period, Defendant Cruickshank sold a total of 21,675 shares of artificially inflated Company stock for proceeds of $1,203,356 (and made no purchases).  Defendant Cruickshank sold 1,675 shares at $68.81 per share for $115,256 on April 10, 2015.  On February 17, 2015, Defendant Cruickshank sold 10,000 shares, at $38.25 per share, for $382,500; and another 10,000 shares, at $70.76 per share, for $707,600.

60.     The Company paid Defendant Cruickshank for his services on the board $391,011 in fees, stock awards and other compensation in 2015; $389,517 in 2014; $403,036 in 2013; and $404,508 in 2012.

61.     According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Cruickshank beneficially owned 69,225 shares of Qualcomm stock.  Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Cruickshank's beneficial ownership of Company stock was worth over $3.2 million.

62.     According to the Schedule 14A that the Company filed with the SEC on January 22, 2015 ("2015 Proxy Statement"):

Sir Donald has been Chairman of 7digital Group plc since June 2014. He was Chairman of Audioboo Ltd. from April 2010 to May 2014, Clinovia Group Ltd. from January 2004 to February 2007 and Formscape Group Ltd. from April 2003 to December 2006. He was a member of the Financial Reporting Council, the body in the U.K. responsible for oversight of the Accountancy and Actuarial professions and for corporate governance standards, from June 2001 to June 2007. Sir Donald has extensive experience in a number of areas, including European regulation and telecommunications. His career has included assignments at McKinsey & Co. Inc., Times Newspapers, Virgin Group plc., Wandsworth Health Authority and the National Health Service in Scotland. Sir Donald served as Chairman of the London Stock Exchange plc. from 2000 to 2003 and as Director General of the U.K.'s Office of Telecommunications (Oftel) from 1993 to 1998. From 1997 to 2000, he served as Chairman of Action 2000, the U.K.'s Millennium Bug campaign. In 1998, Chancellor Gordon Brown appointed him as Chairman of the Government's Review of the U.K. banking sector. From 1999 to 2004, he served as Chairman of SMG plc., one of Scotland's leading broadcasters. Sir Donald holds an M.A. degree from the University of Aberdeen and an M.B.A. degree from Manchester Business School, the University of Manchester, as well as an honorary L.L.D. degree from the University of Aberdeen. He was a member of The Institute of Chartered Accountants in Scotland between 1967 and 2011. We believe Sir Donald's qualifications to serve on our Board include his extensive management experience in a diverse range of companies, his many years of experience in working with governmental organizations, his extensive experience in European regulation and telecommunications policies and administration and his broad experience in international business matters. In addition, as a native of the United Kingdom, with significant pan-European experience, Sir Donald brings a non-U.S. centric perspective, which is beneficial to our Board. He has been designated as an audit committee financial expert. Sir Donald has informed us that, assuming he is re-elected to the Board at the Annual Meeting, he does not intend to stand for re-election to the Board in 2016. Accordingly, he would step down from the Board effective as of the Company's 2016 annual meeting of stockholders.

63.     Upon information and belief, Defendant Cruickshank is a citizen of the United Kingdom.

**Defendant Susan Hockfield**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

64.     Defendant Susan Hockfield ("Hockfield") has been a Company Director since July 2012, and is a member of the Governance Committee.

65.     The Company paid Defendant Hockfield $336,711 in fees, stock awards and other compensation in 2015; $324,067 in 2014; $319,686 in 2013; and $139,769 in 2012.

66.     According to the 2015 Proxy Statement:

Dr. Hockfield has been President Emerita of the Massachusetts Institute of Technology (MIT) since July 2012 and Professor of Neuroscience at MIT since 2004. She was President of MIT from December 2004 to July 2012. Dr. Hockfield joined the faculty of Yale University in 1985 and served as Provost from 2002 to 2004 and dean of the Graduate School of Arts and Sciences from 1998 to 2002. Dr. Hockfield was a member of the scientific staff of the Cold Spring Harbor Laboratory from 1980 to 1985 and a National Institutes of Health (NIH) postdoctoral fellow at the University of California at San Francisco in 1980. Dr. Hockfield has been a director of the General Electric Company since December 2006 and a trustee of the Carnegie Corporation of New York since September 2006. Dr. Hockfield holds honorary degrees from several U.S. and international universities and is a member of the American Academy of Arts and Sciences and a fellow of the American Association for the Advancement of Science. Dr. Hockfield holds a B.A. degree in biology from the University of Rochester and a Ph.D. degree in Anatomy from the Georgetown University School of Medicine. We believe Dr. Hockfield's qualifications to serve on our Board include her significant management and leadership experience developed and demonstrated as President of MIT, a leading research university, and as Provost and a dean at Yale. Throughout our corporate history, we have valued and benefited from our interaction with academic institutions. Dr. Hockfield's experience in education and her perspective as a scientist provides us with important insights as we develop and invest in new technologies and evaluate new ideas. In addition, her service on other public company boards brings valuable perspectives to our Board.

67.     Upon information and belief, Defendant Hockfield is a citizen of Massachusetts.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendant Raymond V. Dittamore**

68.    Defendant Raymond V. Dittamore ("Dittamore") has been a Company Director since 2002.   From March 2009 to March 2011, Defendant Dittamore served as Presiding Director.   Since March 2008, Defendant Dittamore has served as Chairman of the Audit Committee.

69.    During the Relevant Trading Period, Defendant Dittamore sold a total of 2,000 shares of artificially inflated Qualcomm stock for proceeds of $949,060 (and made no purchases).   Defendant Dittamore sold 4,000 shares at $69.01 per share for $276,040 on May 8, 2015.   On February 9, 2015, Dittamore sold 18,000 shares, at $37.39 per share, for $673,020.

70.    The Company paid Defendant Dittamore $340,011 in fees, stock awards and other compensation in 2015; $348,517 in 2014; $349,911 in 2013 and $360,508 in 2012.

71.    According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Dittamore beneficially owned 81,531 shares of Qualcomm stock.   Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Dittamore's beneficial ownership of Company stock was worth over $3.8 million.

72.    According to the 2016 Proxy Statement:

Mr. Dittamore retired in June 2001 as a partner of Ernst & Young LLP, an international public accounting firm, after 35 years of service. Mr. Dittamore previously served as a director of Life Technologies Corporation from July

2001 to February 2014, Gen-Probe Incorporated from August 2002 to September 2009 and Digirad Corporation from March 2004 to March 2008. Mr. Dittamore holds a B.S. degree in accounting from San Diego State University.

We believe that Mr. Dittamore's qualifications to serve on our Board include his many years of financial and accounting experience, including his long service with an international accounting firm as an audit partner and as a member of that firm's management. In addition, Mr. Dittamore has served on other public company boards, where he has gained extensive audit committee experience as well as additional insight into the practices of other boards and their committees. He has been designated as an audit committee financial expert.

73.    Upon information and belief, Defendant Dittamore is a citizen of Colorado.

**Defendant Thomas W. Horton**

74.    Defendant Thomas W. Horton ("Horton") has been a Company Director since 2008.  He is a member of the Audit Committee.

75.    During the Relevant Trading Period, Defendant Horton sold a total of 1,214 shares of artificially inflated Company stock for proceeds of $86,109 (and made no purchases).  On March 26, 2015, Defendant Horton sold 1,214 shares at $70.93 per share for $86,109.

76.    He received from the Company $457,608 in fees, stock awards and other compensation for 2015; he received $363,517 in 2014; $356,036 in 2013; and $357,508 in 2012.

77.    According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Horton beneficially owned 14,591 shares of Qualcomm stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Horton's beneficial ownership of Company stock was worth over $680 thousand.

78.     According to the 2016 Proxy Statement:

Mr. Horton is a Senior Advisor in the Industrials and Business Services Group of Warburg Pincus LLC, a private equity firm focused on growth investing. Mr. Horton was Chairman of American Airlines Group Inc. (formed upon the merger of AMR Corporation (AMR) and US Airways Group, Inc.) from December 2013 to June 2014 and Chairman of American Airlines, Inc. (American) from November 2011 to June 2014. He was Chairman and Chief Executive Officer of AMR and Chief Executive Officer of American from November 2011 to December 2013, and President of AMR and American from July 2010 to December 2013. He served as Executive Vice President and Chief Financial Officer of AMR and American from March 2006 to July 2010. He served as Vice Chairman and Chief Financial Officer of AT&T Corporation (AT&T) from January 2002 to February 2006. Prior to joining AT&T, Mr. Horton was Senior Vice President and Chief Financial Officer of AMR from January 2000 to January 2002 and served in numerous management positions with AMR since 1985. Mr. Horton has been a director of Wal-Mart Stores, Inc. since November 2014. Mr. Horton holds a B.B.A. degree in accounting from Baylor University and an M.B.A. degree from Southern Methodist University.

We believe that Mr. Horton's qualifications to serve on our Board include his management, financial and accounting experience, including his former service as President of AMR, as Vice Chairman and Chief Financial Officer of AT&T and as Executive Vice President and Chief Financial Officer of AMR. In particular, Mr. Horton's roles in operational and financial management at AMR and AT&T bring valuable insights to our Board, as well as providing a useful resource to our senior management. He has been designated as an audit committee financial expert.

79.     Upon information and belief, Defendant Horton is a citizen of Texas.

**Defendant Harish Manwani**

80.     Defendant Harish Manwani ("Manwani") has been a Company

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Director since May 2014.  He is a member of the Finance Committee.

81.    Defendant Manwani received from the Company $323,011 in fees, stock awards and other compensation in 2015; and $199,123 in 2014.

82.    According to the 2016 Proxy Statement:

Mr. Manwani was the Chief Operating Officer for Unilever PLC, a leading global consumer products company, from September 2011 to December 2014. He served as Unilever's President, Asia, Africa, Middle East and Turkey, which was later extended to include Central and Eastern Europe, from April 2005 to August 2011. He served as Unilever's President, Home & Personal Care, North America from March 2004 to March 2005. He served as Unilever's President, Home & Personal Care, Latin America and as the Chairman of Unilever's Latin America Advisory Council from April 2001 to February 2004. He served as Unilever's Senior Vice President, Global Hair and Oral Care from June 2000 to March 2001. He served as a whole time Director on the board of Hindustan Unilever Limited from August 1995 to April 2000, a company he joined as a management trainee in 1976, and subsequently held various general management positions of increasing responsibilities within Unilever globally. Mr. Manwani has been a director of Whirlpool Corporation since August 2011 and Pearson plc since October 2013, and has been the Non-Executive Chairman of Hindustan Unilever Limited since July 2005. He has also been a Global Executive Advisor to the Blackstone Private Equity Group since February 2015 and a director of The Economic Development Board (Singapore) since February 2013 and the Indian School of Business since April 2006. Mr. Manwani previously served as a director of ING Group from April 2008 to April 2010, the Citigroup India Advisory Board from November 2010 to February 2013 and the Human Capital Leadership Institute from October 2012 to February 2014. Mr. Manwani holds a B.Sc. honors degree in statistics and an M.M.S. degree in management studies, both from Mumbai University in India. He has also attended the Advanced Management Program at Harvard Business School.

We believe that Mr. Manwani's qualifications to serve on our Board include his substantial management experience involving international operations, particularly in Asia. His executive management experience, particularly with respect to strategic planning and leadership of complex organizations, provides a valuable resource for our senior management. His experience on the boards of several other companies also brings valuable insights to our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Board.

83.    Upon information and belief, Defendant Manwani is a citizen of the United Kingdom.

**Defendant Mark D. McLaughlin**

84.    Defendant Mark D. McLaughlin ("McLaughlin") has been a Company Director since July 21, 2015, and is as a member of Governance Committee.

85.    The Company paid Defendant McLaughlin $145,622 in fees, stock awards and other compensation in 2015.

86.    According to the 2016 Proxy Statement:

Mr. McLaughlin is Chairman of the Board, President and Chief Executive Officer of Palo Alto Networks, Inc., a network security company. He joined Palo Alto Networks as President and Chief Executive Officer, and as a director, in August 2011 and became Chairman of the Board in April 2012. Mr. McLaughlin served as President and Chief Executive Officer and as a director of VeriSign, Inc., a provider of Internet infrastructure services, from August 2009 through July 2011 and as President and Chief Operating Officer from January 2009 to August 2009. Mr. McLaughlin served in several roles at VeriSign, including as Executive Vice President, Products and Marketing, from February 2000 through November 2007. Prior to joining VeriSign, Mr. McLaughlin was Vice President, Sales and Business Development at Signio Inc., an internet payments company acquired by VeriSign in February 2000. President Barack Obama appointed Mr. McLaughlin to serve on the National Security Telecommunications Advisory Committee (NSTAC) in January 2011 and to the position of Chairman of the NSTAC in 2014. Mr. McLaughlin has been a director of Opower, Inc. since April 2014. Mr. McLaughlin holds a B.S. degree from the U.S. Military Academy at West Point and a J.D. from Seattle University School of Law.

We believe that Mr. McLaughlin's qualifications to serve on our Board include his operational and management experience at several technology companies. Mr. McLaughlin's service on the National Security Telecommunications Advisory Committee, as well as his experience as Chief

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Executive Officer and a member of the Board of Directors of a network security company, provide him with significant knowledge regarding the operations and security of telecommunications systems and cybersecurity matters, which bring valuable insights to our Board. Additionally, pursuant to the Cooperation Agreement with JANA Partners, we have committed to include Mr. McLaughlin on the slate of director nominees recommended by the Board for election at the Annual Meeting.

87.   Upon information and belief, Defendant McLaughlin is a citizen of California.

**Defendant Clark T. Randt, Jr.**

88.   Defendant Clark T. Randt, Jr. ("Randt") has been a Company Director since October 2013, and is the Chairman of the Governance Committee. Defendant Randt is a former Ambassador to the PRC.

89.   Defendant Randt received from the Company $376,969 in fees, stock awards and other compensation for 2015; and $368,378 in 2014.

90.   According to the 2016 Proxy Statement:

Ambassador Randt has been President of Randt & Co. LLC, a company that advises firms with interests in China, since February 2009. He is a former U.S. ambassador to the People's Republic of China, where he served from July 2001 to January 2009. He was a partner resident in the Hong Kong office of Shearman & Sterling, a major international law firm, where he headed the firm's China practice, from January 1994 to June 2001. Ambassador Randt served as First Secretary and Commercial Attaché at the U.S. Embassy in Beijing from August 1982 to October 1984. He was the China representative of the National Council for United States-China Trade in 1974 and he served in the U.S. Air Force Security Service from August 1968 to March 1972. Ambassador Randt is a member of the New York Bar Association and the Council on Foreign Relations. He is also a former governor and first vice president of the American Chamber of Commerce in Hong Kong. Ambassador Randt has been a director of Valmont Industries, Inc. since February 2009, a director of the United Parcel Service, Inc. since

August 2010 and a director of Wynn Resorts Ltd. since October 2015, and he serves on the Advisory Board of the Duke Kunshan University. He is fluent in Mandarin Chinese. Ambassador Randt graduated from Yale University with a B.A. degree in English literature and received a J.D. degree from the University of Michigan. He also attended Harvard Law School where he was awarded the East Asia Legal Studies Traveling Fellowship to China.

We believe that Ambassador Randt's qualifications to serve on our Board include his deep understanding of Asia and experience in facilitating business throughout Asia, which is one of the most important regions to our business. He brings to our Board substantial experience in both diplomacy and international trade, including service as the U.S. Ambassador to The People's Republic of China. His international experience and knowledge of Asian business operations provide valuable insights to our Board.

91.    Upon information and belief, Defendant Randt is a citizen of Connecticut.

**Defendant Francisco Ros**

92.    Defendant Francisco Ros ("Ros") has been a Company Director since 2010.   He is a member of Finance Committee.   Defendant Ros was a Senior Director of Business Development for Qualcomm Spain from 2003 to 2004.

93.    During the Relevant Trading Period, Defendant Ros sold a total of 2,206 shares of artificially inflated Company stock for proceeds of $156,471 (and made no purchases).   Defendant Ros sold 2,206 shares on March 26, 2015, at $70.93 per share, for $156,471.

94.    Defendant Ros received from the Company $336,511 in fees, stock awards and other compensation; in 2014, he received $340,517; in 2013, Defendant Ros collected $332,536; and in 2012, he earned $332,008.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

95.     According to the 2016 Proxy Statement:

Dr. Ros is President of First International Partners, S.L., a business consulting firm he founded in 2002. He was Secretary of State (vice minister) of the Government of Spain from May 2004 to July 2010. He served as a senior director of business development of Qualcomm from July 2003 to April 2004. He was Chairman and CEO of Alua Broadband Optical Access, a company he co-founded, from January 2000 to June 2002. Dr. Ros served as President and CEO of Unisource (a joint venture among KPN, Telia, Swisscom and Telefónica) from May 1996 to October 1998. Dr. Ros headed several business areas within the Telefónica Group from April 1983 to November 1996 and became Managing Director of the holding company and a member of its Executive Management Board. Dr. Ros has been a director of Elephant Talk Communications Corp. since September 2014 and Non-Executive Chairman of Asurion Europe Limited in Spain since April 2014. He was a director of Proteccion On-Line S.L. from October 2012 to June 2013. In 2011, he was the recipient of the Great Cross of the Order of Civil Merit and the Great Plate of Telecommunications and the Information Society, both granted by the Government of Spain. Dr. Ros holds an engineering and a Ph.D. degree in telecommunications from the Universidad Politecnica de Madrid, an M.S. degree in electrical engineering and a Ph.D. degree in electrical engineering and computer science from the Massachusetts Institute of Technology and an advanced management degree from the Instituto de Estudios Superiores de la Empresa Business School in Madrid.

We believe that Dr. Ros's qualifications to serve on our Board include his significant experience related to the regulatory environment in Europe for wireless technology, as well as his technical and business background and education. In addition, Dr. Ros brings a non-U.S. perspective to issues facing us, enhancing the understanding of our Board.

96.     Upon information and belief, Defendant Ros is a citizen of Spain.

**Defendant Jonathan J. Rubinstein**

97.     Defendant Jonathan J. Rubinstein ("Rubinstein") has been a Company Director since 2013, and is a member of Compensation Committee.

98.     Defendant Rubinstein received from the Company $443,511 in fees,

stock awards and other compensation; in 2014, Defendant Rubinstein received $356,017; and in 2013, Defendant Rubinstein received $250,007.

99.    According to the 2016 Proxy Statement:

Mr. Rubinstein was Senior Vice President, Product Innovation for the Personal Systems Group of the Hewlett-Packard Company (HP) from July 2011 to January 2012 and Senior Vice President and General Manager, Palm Global Business Unit of HP from July 2010 to July 2011. Mr. Rubinstein was Chief Executive Officer and President of Palm, Inc. (Palm) from June 2009 until its acquisition by HP in July 2010 and Chairman of the Board of Palm from October 2007 through the date of acquisition. He was Senior Vice President, iPod Division of Apple Inc. (Apple) from 2003 to 2006 and Senior Vice President, Hardware Engineering of Apple from 1997 to 2003. Mr. Rubinstein is a member of the National Academy of Engineering. Mr. Rubinstein has been a director of Amazon.com, Inc. since December 2010. Mr. Rubinstein holds B.S. and M.Eng. degrees in electrical engineering from Cornell University and an M.S. degree in computer science from Colorado State University.

We believe that Mr. Rubinstein's qualifications to serve on our Board include his substantial operational and executive management experience at a range of large technology companies, including senior management responsibilities at HP, Palm and Apple. His experience in addressing product development issues in emerging and evolving technology environments provides our Board with valuable knowledge and insights.

100.   Upon information and belief, Defendant Rubinstein is a citizen of California.

**Defendant Marc I. Stern**

101.   Defendant Marc I. Stern ("Stern") has been a Company Director since February 1994.  Defendant Stern was the Company's Presiding Director from March 2008 to March 2009.  Defendant Stern is the Chairman of the Compensation Committee.

102.   The Company paid Defendant Stern $385,511 in fees, stock awards and other compensation for 2015; $471,224 in 2014; $495,117 in 2013 and $441,309 in 2012.

103.   According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Stern beneficially owned 389,617 shares of Qualcomm stock. Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Stern's beneficial ownership of Company stock was worth over $18.2 million.

104.   According to the 2015 Proxy Statement:

Mr. Stern is Chairman of The TCW Group, Inc. (TCW), a Los Angeles-based asset-management firm with approximately $155 billion of assets under management, and has served as a director of TCW and TCW Funds, Inc., a registered investment management company, since September 1992. Prior to being named Chairman of TCW in February 2013, Mr. Stern served as TCW's Vice Chairman from July 2005 to February 2013, Chief Executive Officer from July 2009 to August 2012 and President from May 1992 to October 2005. From May 2007 to February 2013, he was a member of the Management Committee of Société Générale Group and Chairman of Société Générale Global Investment Management and Services (GIMS) North America unit. TCW was acquired by Société Générale in 2001. Société Générale sold its interest in TCW in 2013 to The Carlyle Group and TCW management. Mr. Stern served as President and a director of SunAmerica, Inc., a financial services company, from 1988 to 1990. Prior to joining SunAmerica, Mr. Stern was Managing Director and Chief Administrative Officer of The Henley Group, Inc., a diversified manufacturing company, and prior to that was Senior Vice President of Allied-Signal Inc., a diversified manufacturing company. Mr. Stern served as a director of Rockefeller & Co., Inc., a wealth management firm, from June 2008 to September 2012. Mr. Stern holds a B.A. degree in political science and history from Dickinson College, an M.A. degree in government from the Columbia University Graduate School of Public Law and Government and a J.D. degree from the Columbia University School of Law. We believe that

Mr. Stern's qualifications to serve on our Board include his many years of business, operational and financial management experience. In addition, his current and prior service on other public company boards permits him to contribute valuable strategic management insight to our Board, both with respect to specific governance and compensation related issues, as well as general leadership. Finally, as a member of our Board since 1994, Mr. Stern brings a valuable historical perspective on the development of the Company's business and its leadership.

105.   Upon information and belief, Defendant Stern is a citizen of California.

**Defendant Sherry Lansing**

106.   Defendant Sherry Lansing ("Lansing") has been the Company's Presiding Director since March 2013.  She has been a Company Director since September 2006.  Defendant Lansing is a member of the Compensation Committee.

107.   Defendant Lansing received from the Company $379,455 in fees, stock awards and other compensation in 2015; $399,017 in 2014; $382,036 in 2013; and $382,008 in 2012.

108.   According to the Company's 2016 Proxy Statement, as of December 14, 2015, Defendant Lansing beneficially owned 41,384 shares of Qualcomm stock. Given that as of the close of business on December 14, 2015, one share of common stock traded for $46.83, Defendant Lansing's beneficial ownership of Company stock was worth over $1.9 million.

109.   According to the 2015 Proxy Statement:

Ms. Lansing is the Founder and has been the Chair of the Sherry Lansing Foundation, a philanthropic organization focusing on cancer research, health

and education, since 2005. From 1992 to 2005, she was the Chair of the Motion Picture Group of Paramount Pictures where she oversaw the release of more than 200 films, including Academy Award® winners Forrest Gump, Braveheart and Titanic. From 1984 to 1990, she operated her own production company, Lansing Productions, and co-founded Jaffe/Lansing Productions. In 1980, she became the film industry's first female to oversee all aspects of a studio's motion picture production when she was appointed President of Production at 20th Century Fox. She holds additional trustee, chair and advisory positions with the Friends of Cancer Research, the American Association of Cancer Research, the Carter Center and Stop Cancer, a non-profit philanthropic group she founded in partnership with Dr. Armand Hammer. Ms. Lansing is also a regent of the University of California and serves as Chair of the University Health Services Committee. Ms. Lansing has been a director of RealD Inc. since May 2010 and was a director of Dole Food Company, Inc. from October 2009 to November 2013. She earned the 2004 Horatio Alger Humanitarian Award, the 2003 Woodrow Wilson Award for Corporate Citizenship, a 2003 honorary doctorate in fine arts from the American Film Institute, the 1989 Alfred P. Sloan, Jr. Memorial Award and the 1982 Distinguished Community Service Award from Brandeis University. She holds a B.S. degree in speech, with minors in English and mathematics, from Northwestern University. We believe that Ms. Lansing's qualifications to serve on our Board include her management and operational experience in the entertainment and content production business. Given the convergence of content and delivery capability, as well as consumer driven technology and device capability, Ms. Lansing's professional experience is of great value to the Board and Qualcomm. In addition, her past and current service on other public company boards brings valuable insights to our Board.

110.   Upon information and belief, Defendant Lansing is a citizen of California.

## INDIVIDUAL DEFENDANTS' DUTIES

111.   By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, at all relevant times the Individual Defendants owed the

Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

112.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

113.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

114.   At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### Defendants' False and Misleading Statements and Omissions

115.   The Company launched Snapdragon 810 on April 7, 2014, its next generation mobile processor in its product line.  The Company signaled, via press

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

release, the new version microchip would be available to certain customers in later half of 2014 and available commercially by first half of 2015.

116.   The Company issued a press release on November 5, 2014, announcing its financial results for the fourth quarter and fiscal year ended September 28, 2014.

117.   In the press release, Defendant Mollenkopf stated that he was "pleased to report another year of record financial performance."

> We are forecasting continuing growth of global 3G/4G device shipments in calendar year 2015, particularly in emerging regions.  Our fiscal 2015 outlook reflects continued LTE leadership in our semiconductor business and is tempered by the issues we are facing in China related to our licensing business.  Through this time, we remain focused on building our technology leadership in smartphones, while pursuing opportunities to extend our solutions into adjacent areas.

118.   The Company reported for its fourth-quarter results revenues of $6.69 billion, an increase of 3% year-over-year, and operating income of $1.99 billion, up 25% year-over-year.

119.   For fiscal 2014, revenues were $26.49 billion, up 7% year-over-year, and operating income up 4% year-over-year, at $7.55 billion.

120.   The Company reiterated these glowing results and reaffirmed the same projections in its annual report for the fiscal year ended September 28, 2014 that it filed on Form 10-K with the SEC on November 5, 2014.  Defendants Mollenkopf, Davis, Alexander, Cruickshank, Dittamore, Hockfield, Horton, Jacobs, Lansing, Manwani, Randt, Ros, Rubinstein, and Stern signed the Form 10-K.

121.   Defendants Mollenkopf and Davis certified the Form 10-K pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX").

122.   The statements referenced in ¶¶ 115-121 were materially false and/or misleading due to failing to disclose that the Company was experiencing weaker-than-expected OEM sales of devices, including in Company products, and, consequently, that the Company's rosy statements about Qualcomm's business and operations were not accurate.   Moreover, the Company omitted to disclose the ongoing difficulties it faced in the PRC in connection with FCPA violations. Company executives were either deliberately reckless in not knowing or were turning a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  As a result, the Company's stock price was trading at artificially inflated levels, and the Individual Defendants failed to correct these false and misleading statements and omissions of material fact.

123.   The Company issued a press release on January 28, 2015 announcing Qualcomm's financial results for the first quarter of fiscal 2015, ended December 28, 2014, in which Qualcomm reported revenues of $7.1 billion.

124.   In the press release, Defendant Mollenkopf announced:

We delivered a strong quarter, achieving record quarterly revenues and Non-GAAP operating income, and we also are very pleased to have resolved our previously disclosed dispute with a licensee in China. . .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2   Looking ahead, we have lowered our revenue outlook for our semiconductor
3   business for the second half of the fiscal year and lowered our EPS
    expectations.  These changes reflect our revised expectations related to OEM
4   mix, sales to a large customer and heightened competition in China.

5   125.   The Company reiterated these results in its quarterly report for the first

6   quarter of fiscal 2015, ended December 28, 2014, that it filed on Form 10-Q with
7
8   the SEC on January 28, 2015.  Defendant Davis signed the Form 10-Q.

9   126.   Defendants Mollenkopf and Davis certified the Form 10-Q pursuant to
10
11  the Exchange Act and SOX.

12  127.   With regard to the lowering of outlook in the semiconductor business

13  for the second half of fiscal 2015, the Company attributed it to:  (1) a shift in share

14  among OEMs at the premium tier, which has reduced near-term opportunity for
15
16  sales of integrated SnapdragonTM processors, skewing product mix towards more

17  modern chipsets in the premium tier; (2) expectations that Snapdragon 810 will not

18  be in the upcoming design cycle of a large customer's flagship device; and (3)
19
20  heightened competition in the PRC.

21  128.   The Company stock price fell on the following day over 10%, $7.30
22
23  per share, to close at $63.69 per share.

24  129.   The statements referenced in ¶¶ 123-127 were materially false and/or

25  misleading and/or failed to disclose that the Company was experiencing weaker-
26
27  than-expected OEM sales of devices, including in Company products.  Therefore,

28  the Company's glowing statements about Qualcomm's business and operations

33

were not accurate.   Moreover, the Company omitted to disclose the ongoing

difficulties it faced in the PRC in connection with FCPA violations.   The Individual

Defendants knew or recklessly turned a blind eye to the fact that the Company's

weaker-than-expected OEM sales were negatively impacting the Company's

bottom line.   Consequently, the Company's stock price was trading at artificially

inflated levels, and the Individual Defendants failed to correct these false and

misleading statements and omissions of material fact.

130.   The Company issued a press release on April 22, 2015, announcing its

financial results for its second quarter of fiscal 2015, ended March 29, 2015.

131.   Defendant Mollenkopf, in the press release, announced, "We are

pleased with our second quarter results, with record licensing revenues and earnings

driven by all-time high 3G/4G device shipments reported by our licensees.   We

continue to see robust global demand for 3G/4G devices, including in China where

our licensing business is now better positioned to participate in the rapidly

accelerating adoption of our 3G/4G technology."

132.   Defendant Mollenkopf reiterated his outlook for QCT, the

semiconductor business, as follows:

> While we remain confident in the significant growth opportunities ahead, we
> are reducing our [ ] outlook [ ], primarily due to the increased impact of
> customer share shifts within the premium tier and a decline in our share at a
> large customer.   In addition to our ongoing expenses management initiatives,
> we have initiated a comprehensive review of our cost structure to identify
> opportunities to improve operating margins while at the same time extending
> out technology and product leadership positions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

133.   In the press release, the Company also reported revenues of $6.9 billion, and GAAP EPS of $0.63.

134.   The Company reiterated the financial statements and results contained within the press release in the Form 10-Q that the Company filed with the SEC on April 22, 2015 for the quarter ended March 29, 2015.  Defendant Davis signed the Form 10-Q.

135.   Defendants Mollenkopf and Davis certified the Form 10-Q pursuant to the Exchange Act and SOX.

136.   The statements referenced in ¶¶ 131-135 were materially false and/or misleading and/or failed to disclose that the Company was experiencing weaker-than-expected OEM sales of devices, including in Company products.  Therefore, the Company's rosy statements about its business and operations were not accurate.  Moreover, the Company omitted to disclose the ongoing difficulties it faced in the PRC in connection with FCPA violations.  The Individual Defendants knew or recklessly turned a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  Consequently, the Company's stock price was trading at artificially inflated levels, and the Individual Defendants failed to correct these false and misleading statements and omissions of material fact.

137.   The Company issued a press release on July 22, 2015 announcing Qualcomm's financial results for the third quarter of fiscal 2015, ended June 28, 2015.  In the press release, the Company lowered sales and earnings forecasts due, in part, to weaker-than-expected OEM sales of devices that included Company products, and an inventory build-up of chips.

138.   In the press release, Defendant Mollenkopf stated, "Our fiscal third quarter revenues, MSM chip shipments and EPS were within prior expectations, and we took a significant step towards our increased capital return commitments through the initiation of a $5 billion accelerated share repurchase as part of our plan to repurchase an additional $10 billion in stock by March 2016."

139.   In the press release, Defendant Mollenkopf also discussed the Company's Strategic Realignment Plan as part of a comprehensive review of the Company's cost structure, stating:

> [T]he Strategic Realignment Plan [was] designed to improve execution, enhance financial performance and drive profitable growth.  Importantly, the changes we are announcing today are designed to enable us to right-size our cost structure and reposition Qualcomm for improved financial and operating performance.  We will continue to invest to build upon our technology leadership position and capitalize on the significant long-term opportunities before us in order to create sustainable long-term value for stockholders.

140.   The Company reiterated the financial statements and results contained within the press release in the Form 10-Q that the Company filed with the SEC on the same day for the quarter ended June 28, 2015.  Defendant Davis signed the Form 10-Q.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

141.   Defendants Mollenkopf and Davis certified the Form 10-Q pursuant to the Exchange Act and SOX.

142.   The statements referenced in ¶¶ 137-141 were materially false and/or misleading and/or failed to disclose that the Company was experiencing weaker-than-expected OEM sales of devices, including in Company products.   Therefore, the Company's glowing statements about Qualcomm's business and operations were not accurate.   Moreover, the Company omitted to disclose the ongoing difficulties it faced in the PRC in connection with FCPA violations.   The Individual Defendants knew or recklessly turned a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.   Consequently, the Company's stock price was trading at artificially inflated levels, and the Individual Defendants failed to correct these false and misleading statements and omissions of material fact.

143.   The Company stock price fell 3.75% on July 23, 2015, or $2.41 per share, to $61.78.

144.   The Company's stock price closed at $45.34 per share on January 29, 2016.

## Qualcomm's FCPA Violations Caused by the Individual Defendants

145.   The Individual Defendants have a fiduciary duty at all times to conduct lawful acts, to comply with all laws and regulations, and to ensure that the

Company has a system of internal controls in place to monitor and maintain FCPA compliance.

146.   During the Relevant Period, the Individual Defendants breached their duty by failing to maintain an effective internal system of controls and caused or allowed the Company to violate the FCPA in the PRC.

147.   The PRC is central to the Company's business. Customers based in the PRC accounted for more than 50% of the Company's 2014 revenues.

148.   Indeed, the Company has stated, the Company's "future success will depend on [its ability to] strengthen integrated circuit products roadmap for, and develop channel relationships in, emerging geographic regions, such as China."

149.   The Company disclosed in the Company's quarterly report on Form 10-Q filed with the SEC on February 1, 2012 that the DOJ had commenced a preliminary investigation in connection with the Company's FCPA compliance. The Company also disclosed that the SEC had initiated an inquiry regarding the Company's FCPA compliance.

150.   The Company had announced in its quarterly report filed with the SEC on July 18, 2012 that the Company's Audit Committee had begun its own internal investigation.

151.   The Company received notice on March 13, 2014 that the SEC determined to recommend that the SEC file an enforcement action against the

Company for violations of the anti-bribery, Books and Records, and internal control provisions of the FCPA.

152.   In the Wells Notice sent to Qualcomm, the Company was made aware it could be subjected to a civil action seeking remedies, *inter alia*, including disgorgement of profits, the retention of an independent compliance monitor to review the Company's FCPA compliance, and an injunction.

153.   The Company announced on April 23, 2014 that the Audit Committee had completed its internal review into the Company's compliance with the FCPA.

154.   The Company stated that the Audit Committee found "instances in which special hiring consideration, gifts or other benefits were provided to several individuals associated with Chinese state-owned companies or agencies."

155.   Discussions of top government Chinese officials accepting "huge rewards" from the Company occurred in the media once the public became aware of the Wells Notice and the Audit Committee's findings of bribery.

156.   The Individual Defendants have breached their duties to implement and/or maintain an effective system of FCPA controls and have failed in their duty to protect the Company from violating the FCPA when engaged in business with its customers in the PRC (and Korea).

157.   The Company has had a pattern of engaging in such illegal conduct.

158.   Indeed, back in 2009, South Korea's Fair Trade Commission found the Company guilty of abusing its position by charging higher royalties for certain

patents to customers that bought chips from Qualcomm competitor companies while simultaneously giving rebates to companies that used the Company's chips.

159.   South Korea's Fair Trade Commission fined the Company $236 million.

160.   The Company appealed the decision to so fine it.

161.   Qualcomm's appeal was denied in 2013.

162.   Additionally, towards the end of 2013, the PRC's National Development and Reform Commission ("NDRC") initiated an investigation into the Company's patent licensing practices, focusing on allegations that the Company was (i) basing royalties on the entire device instead of at the customary chip level, and charging unfairly high prices as a result; (ii) charging higher prices to certain Chinese and Korean companies; (iii) connecting the sale of chips to patent licenses; and (iv) not granting patent licenses to competing chip-making companies.

163.   The NDRC found the Company liable under the PRC's Anti-Monopoly Law.

164.   The Company agreed to settle the NDRC findings on February 9, 2015, by not disputing the findings, by paying a fine in the amount of $975 million, and by changing Qualcomm's licensing practices.

## DAMAGES TO QUALCOMM

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

165.   As a direct and proximate result of the Individual Defendants' conduct, the Company has been seriously harmed and will continue to be.

166.   As a direct and proximate result of the Individual Defendants' misconduct, the Company's expenditures and losses include, but are not limited to:

- legal fees associated with the class action lawsuit filed against the Company and certain Individual Defendants for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations;

- costs sustained from paying any settlement with the SEC and DOJ;

- costs sustained from the SEC and DOJ investigations;

- costs sustained from the Company's internal investigation into the FCPA violations performed by the Audit Committee;

- costs sustained from creating and maintaining adequate FCPA controls;

- costs sustained from the improper payments made to high-level governmental officials in the PRC; and

- costs sustained and benefits paid to all Individual Defendants due to their breach of fiduciary duties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

167.   In addition, the Company's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its misconduct, its false statements, and the true condition of its business. The credibility and motives of management are now in serious doubt.

168.   The actions complained of herein have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

169.   Plaintiff brings this action derivatively in the right and for the benefit of Qualcomm to redress injuries suffered, and to be suffered, by Qualcomm as a direct result of breaches of fiduciary duty and abuse of control by the Individual Defendants. Qualcomm is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

170.   Plaintiff will adequately and fairly represent the interests of Qualcomm in enforcing and prosecuting its rights.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

171.   Plaintiff has continuously been a shareholder of Qualcomm at all times relevant to the wrongdoing complained of and is a current Qualcomm shareholder.

172.   At the time of filing of this action, the Board consisted of the following sixteen Directors: Individual Defendants Alexander, Cruickshank, Dittamore, Hockfield, Horton, Jacobs, Lansing, McLaughlin, Manwani, Mollenkopf, Randt, Ros, Rubinstein, and Stern, and non-defendants Jeffrey W. Henderson and Anthony J. Vinciquerra (collectively, the "Directors").

173.   Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

174.   Plaintiff needs only to allege demand futility as to eight of the sixteen Directors.

### **Defendant Mollenkopf**

175.   Defendant Mollenkopf  has been the Company's CEO; therefore, he is a non-independent director.   Indeed, the Company paid Defendant Mollenkopf $10.3 million in in salary, bonus, stock awards and other compensation in 2015, $60.7 million in 2014, and $14.3 million in 2013.   During the Relevant Trading Period, Defendant Mollenkopf sold 111,885 shares of artificially inflated Qualcomm stock for proceeds of $7,956,242 on inside material information at a time when he was the most responsible for the Company's fraud, which evidences his motive and opportunity in engaging in and facilitating the fraud.   Moreover, that

Defendant Mollenkopf owned about $13.1 million worth of Company stock reveals his interest in maintaining the Company stock price as high as possible.

176.   Defendant Mollenkopf certified the Company's public filings with the SEC and met directly with investors and securities analysts to discuss Company operations and business.   As the maker of the false and misleading statements of material fact as alleged herein, Defendant Mollenkopf breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Mollenkopf knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Due to his experience working as an executive of the Company and his service on the Board, Defendant Mollenkopf knew, or should have known, during the Relevant Period, that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.   Defendant Mollenkopf also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.   Additionally, Defendant Mollenkopf is a defendant in the federal securities fraud class action lawsuit.   Thus, Mollenkopf faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

**Defendant Jacobs**

177.   Defendant Jacobs was the Company's Executive Chairman, and thus is a non-independent director.  In 2014, the Company paid Defendant Jacobs $56.9 million in salary, bonus, stock awards and other compensation in 2014, $20.4 million in 2013 and $20.7 million in 2012.  During the Relevant Trading Period, Defendant Jacobs sold 411,561 shares of artificially Qualcomm stock for proceeds of $25,970,586, which evidences his motive and opportunity in engaging in and facilitating the fraud.  Moreover, that Defendant Jacobs owned over $83 million worth of Company stock reveals his interest in maintaining the Company stock price as high as possible.

178.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Jacobs knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Due to his experience working as an executive of the Company and his service on the Board, Defendant Jacobs knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.  Defendant Jacobs also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  Thus, as a non-independent director, and as an officer who was directly responsible for the Company's fraud, he

faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**Defendant Cruickshank**

179.   Defendant Cruickshank was a Company director since June 2005.  The Company paid Defendant Cruickshank $391,011 in fees, stock awards and other compensation in 2015; $389,517 in 2014; $403,036 in 2013; and $404,508 in 2012. During the Relevant Trading Period, Defendant Cruickshank sold 21,675 shares of artificially inflated Company stock for proceeds of $1,203,356, which demonstrates his motive and opportunity in engaging in and facilitating the fraud.  Moreover, that Defendant Cruickshank owned over $3.2 million of Company stock reveals his interest in maintaining the Company stock price as high as possible.

180.   Significantly, as a member of the Audit Committee, Defendant Cruickshank is charged with reviewing the Company's accounting practices and systems of internal accounting controls as well as the objectivity of its financial reporting.   Also, as a member of the Audit Committee, Defendant Cruickshank knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.   Defendant Cruickshank also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were

negatively impacting the Company's bottom line.   Moreover, Defendant Cruickshank, along with the other members of the Audit Committee, is answerable to the Company and the shareholders to review the Company's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Audit Committee.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Cruickshank knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Defendant Cruickshank is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

### Defendant Dittamore

181.   Defendant Dittamore was a Company Director since 2002.   The Company paid Defendant Dittamore $340,011 in fees, stock awards and other compensation in 2015; $348,517 in 2014; $349,911 in 2013; and $360,508 in 2012. During the Relevant Trading Period, Defendant Dittamore sold 2,000 shares of artificially inflated Qualcomm stock for proceeds of $949,060, which demonstrates Defendant Cruickshank's motive and opportunity in facilitating the fraud. Moreover, that Defendant Dittamore owned over $3.8 million of Company stock reveals his interest in maintaining the Company stock price as high as possible.

182.   Since March 2008, Defendant Dittamore has been Chairman of the

Company's Audit Committee, and as such, Defendant Dittamore knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.   Defendant Dittamore also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.   Moreover, Defendant Dittamore, along with the other members of the Audit Committee, is answerable to the Company and the shareholders to review the Company's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Audit Committee.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Dittamore knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Defendant Dittamore is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**Defendant Horton**

183.  Defendant Horton has been a Company Director since 2008. Defendant Horton is a member of the Audit Committee.   Defendant Horton received from the Company $457,608 in fees, stock awards and other compensation

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for 2015; he received $363,517 in 2014; $356,036 in 2013; and $357,508 in 2012. During the Relevant Trading Period, Defendant Horton sold 1,214 shares of artificially inflated Company stock for proceeds of $86,109, which demonstrates his motive and opportunity in facilitating the fraud.

184.   As a member of the Audit Committee since March 2008, Defendant Horton knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.  Defendant Horton also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  Moreover, Horton, along with the other members of the Audit Committee, is answerable to the Company and the shareholders to review the Company's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the Audit Committee.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Horton knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Thus, as Defendant Horton is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**Defendant Randt**

185.   Defendant Randt has been a Company Director and the Chairman of the Governance Committee since October 2013.   Defendant Randt received from the Company $376,969 in fees, stock awards and other compensation for 2015 and $368,378 in 2014.

186.   Defendant Randt is a former Ambassador to the PRC.   Due to his service on the Board, chairmanship of the Company's Governance Committee, and especially his international expertise, particularly with regard to the PRC, Defendant Randt knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.   Defendant Randt also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.   As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Randt knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Defendant Randt is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**Defendant Ros**

187.  Defendant Ros is a Company director and a member of Finance Committee.  Defendant Ros received from the Company $336,511 in fees, stock awards and other compensation; in 2014, he received $340,517; in 2013, Defendant Ros collected $332,536; and in 2012, he received $332,008.  During the Relevant Trading Period, Defendant Ros sold 2,206 shares of artificially inflated Company stock for proceeds of $156,471, which demonstrates Defendant Ros's motive and opportunity in engaging in and facilitating the fraud.

188.  Due to his service on the Board, Defendant Ros knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.  Defendant Ros also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Ros knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Thus, as Defendant Ros is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**Defendant Stern**

189.   Defendant Stern acted as a Company director and currently serves as Chairman of Compensation Committee.   The Company paid Defendant Stern $385,511 in fees, stock awards and other compensation for 2015; $471,224 in 2014; $495,117 in 2013; and $441,309 in 2012.  That Defendant Stern owned over $18.2 million of Company stock reveals his interest in maintaining the Company stock price as high as possible.

190.   Due to Defendant Stern's service on the Board, Defendant Stern knew, or should have known, during the Relevant Period that the Company's overseas operations were subject to the FCPA and its provisions with respect to anti-bribery, Books and Records, and the need to create and maintain a system of internal controls to detect and prevent violations of the FCPA.   Defendant Stern also knowingly or recklessly permitted the Company to turn a blind eye to the fact that the Company's weaker-than-expected OEM sales were negatively impacting the Company's bottom line.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Stern knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.   Thus, as Defendant Stern is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

**All of the Directors who are Named herein as the Individual Defendants**

191.   Moreover, all of the Directors, except for Henderson and Vinciquerra,

certified the annual report on Form 10K for the fiscal year ended September 28, 2014, filed with the SEC on November 5, 2014, which contained the false and misleading statements of material fact alleged herein, and as a result, each of them faces a substantial likelihood of liability for actually making the false and misleading statements.

192.   Thus, demand is excused as to all of the Directors who are Individual Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

# COUNT I

## Breach of Fiduciary Duty

193.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.   Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

195.   Each of the Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Qualcomm.

196.   In breach of their fiduciary duties owed to Qualcomm, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

197.   In breach of their fiduciary duties owed to Qualcomm, the Individual Defendants knowingly or recklessly permitted the Company's internal controls to be materially weak and deficient.

198.   In breach of their fiduciary duties owed to Qualcomm, the Individual Defendants knowingly or recklessly failed to maintain a system of internal controls to detect and prevent violations of the FCPA.

199.   In breach of their fiduciary duties owed to the Company, the Individual Defendants knowingly or recklessly made material misrepresentations and/or caused the Company to make material misrepresentations of the Company's business operations and prospects and failed to correct those misrepresentations.

200.   These actions and misstatements and omissions were not the result of a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

201.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

**COUNT II**

**Unjust Enrichment**

202.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.   The Individual Defendants have been unjustly enriched by their wrongful acts and the misstatements and omissions of material fact that they caused and/or allowed to be made and either benefitted financially and received lucrative bonuses relating to the false and misleading statements, received bonuses, stock options, or similar compensation from Qualcomm relating to the performance or artificially-inflated valuation of Qualcomm, all to due to or resulting from the harm to Qualcomm, or benefitted financially from their lucrative insider sales.

204.   Plaintiff, as a shareholder and a representative of Qualcomm, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, and all profits obtained through insider sales, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

205.   Plaintiff, on behalf of Qualcomm, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment on behalf of Qualcomm as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(a) Declaring that Plaintiff may maintain this action on behalf of Qualcomm, and that Plaintiff is an adequate representative of the Company;

(b) Against all defendants, jointly and severally and in favor of Qualcomm for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment;

(c) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Qualcomm;

(d) Directing the Individual Defendants to take all necessary actions to reform and improve Qualcomm's corporate governance and internal procedures to comply with applicable laws and to protect Qualcomm and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

> (i) a proposal to strengthen the Company's disclosure and financial controls;
>
> (ii) a proposal to strengthen Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
>
> (iii) a provision to permit the shareholders of Qualcomm to nominate at least eight candidates for election to the Board; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(iv) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Determining and awarding to Qualcomm exemplary damages, including disgorgement of all profits, benefits, proceeds from insider sales of Qualcomm stock, and other compensation obtained by the Individual Defendants, in an amount necessary to punish the Individual Defendants and to make an example of the Individual defendants to the community according to proof at trial;

(f)     Awarding Qualcomm restitution from the Individual Defendants, and each of them;

(g)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.


Dated:  February 2, 2016                    Respectfully submitted,

**LAW OFFICES OF ROBERT C. MOEST**

By: /s Robert C. Moest
Robert C. Moest, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*-and-*

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

—————

*Counsel for Plaintiff*

58
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, Danny Huntley, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 3'9th day of January, 2016.

Danny Huntley